UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RHONDA BEERTHUIS,

              Plaintiff,                                        Hon. Paul L. Maloney

v.                                                    Case No. 1:07-CV-344

COMMISSIONER OF SOCIAL
SECURITY,

              Defendant.
_____/


## REPORT AND RECOMMENDATION

       This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  Section 405(g)

limits the Court to a review of the administrative record, and provides that if the Commissioner's

decision is supported by substantial evidence, it shall be conclusive.

       Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges

to submit proposed findings of fact and recommendations for disposition of social security appeals,

the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

2

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.


## **PROCEDURAL POSTURE**

Plaintiff was 52 years of age at the time of the ALJ's decision.  (Tr. 25).  She successfully completed high school and worked previously as a teacher's assistant and a hospice caretaker.  (Tr. 25, 91, 119-23).

Plaintiff applied for benefits on August 7, 2003, alleging that she had been disabled since December 1, 2001, due to "bulging disks," headaches, and memory difficulties.  (Tr. 70-72, 90).  Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 37-69).  On January 14, 2005, Plaintiff appeared before ALJ Douglas Johnson, with testimony being offered by Plaintiff, vocational expert, Richard Riedl, and two of Plaintiff's friends.  (Tr. 391-429).  In a written decision dated October 11, 2005, the ALJ determined that Plaintiff was not disabled. (Tr. 25-36).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 5-8).  Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

On November 30, 2001, Plaintiff "slipped and fell. . .striking the back of her head." (Tr. 144). Plaintiff reported to a hospital the following day because she was experiencing a headache and sore neck. (Tr. 144). An examination of Plaintiff's neck revealed tenderness at C4 and C5 with "some muscular tenderness diffusely bilaterally." (Tr. 144). An examination of Plaintiff's extremities revealed "good strength, sensation, circulation and reflexes" and Plaintiff exhibited "full and conjugate" extraocular movements. (Tr. 144). X-rays of Plaintiff's cervical spine were "negative," with no evidence of misalignment, vertebral body abnormality, or soft tissue swelling. (Tr. 147). A CT scan of Plaintiffs head was likewise "negative," with no evidence of fracture, hemorrhage, or mass effect. (Tr.148).

On December 13, 2001, Plaintiff began participating in physical therapy. (Tr. 193-95). Plaintiff reported that she experienced head and neck pain which ranged from 2-6 (on a scale of 1-10). (Tr. 193). The goal of physical therapy was to achieve a "reduction in pain and stiffness in [Plaintiff's] upper back, shoulders, and neck." (Tr. 194). On December 27, 2001, Plaintiff began participating in "outpatient neurorehabilitation" because she was exhibiting "mild/moderate cognitive difficulties in the areas of attention, memory and organization." (Tr. 185-86).

Neurorehabilitation treatment notes dated January 22, 2002, reveal that Plaintiff's condition was "improving." (Tr. 182). The therapist observed that Plaintiff was "more physically relaxed" and that "her responses are more spontaneous and carefree." (Tr. 182).

On January 29, 2002, Plaintiff reported that she was still experiencing memory difficulty, but was "definitely making gains." (Tr. 178). The neurorehabilitation therapist reported that Plaintiff continued to improve and exhibited "better recall of past sessions." (Tr. 178).

4

Neurorehabilitation treatment notes dated February 12, 2002, reveal that Plaintiff continued to make progress.  (Tr. 174).

On March 28, 2002, Plaintiff met with her neurorehabilitation therapist.  (Tr. 163-64). Plaintiff reported that she recently took a two week vacation to Florida.  (Tr. 163).  Plaintiff reported that this vacation "did [her] a lot of good" and that she was "feeling better."  (Tr. 163).  The therapist reported that Plaintiff "appeared more alert" and "spoke more spontaneously with expression. . .than she has in any previous sessions."  (Tr. 163).

Plaintiff was discharged from neurorehabilitation therapy on April 25, 2002.  (Tr. 159-60).  Plaintiff's therapist reported that Plaintiff met all of her independent living, vocational, and psychosocial goals and that she was only "mildly" impaired.  (Tr. 159-60).  Plaintiff was discharged from physical therapy the same day.  (Tr. 157-58).  Plaintiff reported that she was performing her home exercise program and that her pain had decreased by 50 percent.  (Tr. 157).  The therapist reported that "if [Plaintiff] continues to perform a home exercise program, that her complaints of pain should continue to improve."  (Tr. 158).

On October 18, 2002, Plaintiff was examined by Ara Schmitt, Ph.D. with Mary Free Bed Hospital and Rehabilitation Center.  (Tr. 196-98).  Plaintiff reported that she "has not been the same since the fall," citing "deficits in attention and concentration, memory difficulties" and "increased processing time."  (Tr. 196).  Plaintiff also reported "the loss of senses of taste and smell."  (Tr. 196).  Plaintiff's affect was "broad in range, but somewhat dramatic."  (Tr. 197).  Dr. Schmitt noted that Plaintiff "appeared invested in communicating to me the disabling nature of her injury and making me aware of her degree of impairment."  (Tr. 197).  The doctor also noted that

5

"[w]hen discussing her self-reported limitations, [Plaintiff] would occasionally cry, but quickly regain composure." (Tr. 197).

Plaintiff participated in various cognitive assessments. (Tr. 197). With respect to Plaintiff's performance on these assessments, Dr. Schmitt reported the following:

> A summary of the formal psychometric data is attached and should be interpreted with great caution. Briefly, [Plaintiff] appeared to be given to inconsistent effort and/or symptom magnification. The first task completed was the TOMM. Her poor performance on this task was out of proportion to her injury severity and strongly indicative of an invalid response set. The importance of trying her best and providing best effort was again reinforced right after completion of the TOMM. However, her performance continued to be extremely unusual. Her remarkably poor performance on the Forced Choice task of the CVLT-II is particularly concerning given that all persons within. . .the standardization of the instrument, as well as most patients with severe brain injuries or advanced dementia, are known to perform better than she did. Given her abnormally poor overall performance and indications of inconsistent effort, the validity of additional cognitive testing data came into question and it was decided to administer a self-report behavioral measure to determine if other psychological factors (e.g., depression) might be present and help explain her remarkably poor performance. Before this was administered, [Plaintiff] was again encouraged to try her best and was told that her performance thus far was unexpected given. . .the mild extent of her injury.
>
> Her responses on the MMPI-2 were consistent and she was not given to random responding. However, validity indicators suggested that [Plaintiff] responded in a way to make herself appear favorable and virtuous. Also clear were indications of her somatic complaints, but she did not endorse frank depression. She did not appear to attempt to fake insanity on this instrument, which is not surprising because she appeared to be more interested in convincing others of her cognitive (not emotional) dysfunction.

(Tr. 197-98).

Dr. Schmitt concluded that:

> The profile of the current neuropsychological test results is
> inconsistent with sequelae of head trauma, and multiple indicators of
> inconsistent effort and/or symptom magnification are present.  Her
> performance is especially concerning in the context of the fact that
> she is currently attempting to seek long-term disability.

(Tr. 198).

A subsequent review of these test results by Ned Kirsch, Ph.D. confirmed Dr. Schmitt's interpretation thereof.  (Tr. 216).  Dr. Kirsch agreed with Dr. Schmitt that Plaintiff's performance on these tests was "markedly lower than what might be expected of individuals having significantly more severe brain injuries."  (Tr. 216).  Dr. Kirsch concluded that Plaintiff's performance on this testing was not representative of her underlying cognitive ability.  (Tr. 216).

On December 20, 2002, Plaintiff participated in an MRI examination of her brain, the results of which were "negative," with no evidence of abnormality.  (Tr. 332).

On January 8, 2003, Dr. Paul Ariagno authored a letter regarding Plaintiff's condition. (Tr. 200).  The doctor reported that he had been treating Plaintiff since February 14, 2002.  (Tr. 200). Dr. Ariagno reported that "[a] thorough workup has been performed including MRI of the brain, various laboratory studies, EEG, and neuropsychological evaluation," but "[n]o obvious abnormality or problems have been found."  (Tr. 200).

On April 28, 2003, Plaintiff reported to a local emergency room, claiming she was "crazier than a loon."  (Tr. 235-37).  Plaintiff reported that she was experiencing depression, emotional lability, headaches, and memory difficulties.  (Tr. 235).  When asked why she reported to the emergency room, Plaintiff responded, "I'm sick of it."  (Tr. 236).  A representative with Allegan County Community Mental Health examined Plaintiff and arranged for her to undergo an

7

evaluation, scheduled for two weeks hence.  (Tr. 229, 236-37).  Plaintiff was then discharged home, at which point her condition was characterized as "satisfactory."  (Tr. 237).

On April 30, 2003, Plaintiff voluntarily admitted herself to Holland Community Hospital.  (Tr. 225-28).  Plaintiff reported that she could not wait two weeks for an appointment at Allegan County Community Mental Health.  (Tr. 229).  Plaintiff was able to express herself "without difficulty," but her affect was described as "quite labile."  (Tr. 227-28).  Plaintiff was diagnosed with depression and admitted to the hospital.  (Tr. 228).

Plaintiff was prescribed antidepressant medication and she participated in "psychoeducational groups and group therapy."  (Tr. 223).  Plaintiff responded well to treatment and was discharged on May 2, 2003.  (Tr. 223).  At discharge, Plaintiff was "alert and oriented in all spheres" and her "mood [was] bright and her affect animated."  (Tr. 223-24).  Plaintiff's thought processes were "logical and organized" and her judgment and insight were described as "good."  (Tr. 224).  Plaintiff stated that, "I think I just needed some time to vent and to get started on meds."  (Tr. 224).  Plaintiff was diagnosed with major depression, single episode, moderate, without psychotic features.  (Tr. 223).  Her GAF score was rated as 59.[1]  (Tr. 223).

On May 13, 2003, Plaintiff applied for assistance from Allegan County Community Mental Health Services and was examined by Elizabeth Oppewal, M.A., L.L.P.  (Tr. 254-61).  Plaintiff reported experiencing "memory difficulty," but exhibited no difficulty providing the "facts and numbers requested."  (Tr. 259).  Plaintiff experienced "no difficulty" when "asked to repeat

---

[1]  The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV).  A GAF score of 59 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning."  DSM-IV at 34.

answers to questions asked previously." (Tr. 259). The results of a mental status examination were unremarkable. (Tr. 256-57). Oppewal noted that Plaintiff "reported depression and frequent crying and even appeared to try to start crying during the intake but never did." (Tr. 259).

Oppewal observed that "[t]here was no evidence of major mental illness or disturbance at the time of intake, (no lability of mood, no confusion of thought, no neglect of self-care, no evidence of or reported hallucinations, delusions, etc.), and, in fact, no difference from this writer's previous contacts with this individual when she was employed with Ottawa County Community Mental Health." (Tr. 259). Oppewal concluded that Plaintiff "does not have a major mental illness which would require treatment from ACCMHS at this time." (Tr. 259). Plaintiff's GAF score was rated as 65.[2] (Tr. 259).

On August 1, 2003, Plaintiff reported to Holland Community Hospital. (Tr. 305-06). Plaintiff reported that she "fell down" the courthouse stairs on July 22, 2003, and was experiencing pain in her buttocks which radiated into her right lower extremity. (Tr. 305). Plaintiff was able to walk without difficulty. (Tr. 305-06). Plaintiff was able to "touch [her] chin to chest without difficulty" and exhibited "full range of motion of neck." (Tr. 306). Straight leg raising was negative and Plaintiff was able to heel/toe walk without difficulty. (Tr. 306). Palpation of Plaintiff's SI joint produced "basic generalized tenderness," but there was no evidence of "tenseness" in Plaintiff's paraspinal muscles. (Tr. 306).

---

[2] A GAF score of 65 indicates that the individual is experiencing "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

X-rays of Plaintiff's lumbar spine, taken on August 18, 2003, revealed evidence of "mild" scoliosis, but were otherwise "unremarkable." (Tr. 330). X-rays of Plaintiff's right knee, taken the same day, were "negative." (Tr. 330).

On August 25, 2003, Dr. Kara Krol authored a letter concerning her review of Plaintiff's medical history. (Tr. 337). The doctor determined that there existed no evidence that Plaintiff's ability to sit, stand, walk, lift, carry, handle objects, hear, speak, or travel was impaired. (Tr. 337). Dr. Krol found that Plaintiff experiences "decreased concentration, decreased ability to remember instructions and locations, and a decreased attention span, but no medical condition other than a psychiatric cause has been found for this." (Tr. 337).

On September 4, 2003, Plaintiff's friend, Marcia DeJong, completed a questionnaire regarding Plaintiff's activities. (Tr. 102-10). DeJong reported that on a typical day, Plaintiff helps her son prepare for school, performs housework, runs errands, cooks, and performs yardwork. (Tr. 102-05). According to DeJong, Plaintiff is "in & out all day" driving her motorcycle. (Tr. 105). DeJong also reported that Plaintiff shops, reads, watches television, and attends garage sales. (Tr. 105-06). DeJong reported that Plaintiff rides her motorcycle "a lot" in the summer and that "everyone in her neighborhood" stops by Plaintiff's residence to visit. (Tr. 106).

On October 8, 2003, Plaintiff was examined by Dr. Daniel Mankoff. (Tr. 379-80). Plaintiff reported that she was experiencing back pain. (Tr. 379). Straight leg raising was negative and Plaintiff exhibited "full lumbar flexion and extension." (Tr. 379). Palpation of the right lumbar area and right SI joint produced tenderness. (Tr. 379). Patrick's sign[3] was positive on the right but

---

[3] Patrick's test is used to determine whether a patient suffers from arthritis of the hip joint. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* P-81 (Matthew Bender) (1996).

10

negative on the left.  (Tr. 379).  Plaintiff was administered a "therapeutic SI joint injection."  (Tr. 380).

On October 14, 2003, William Schirado, Ph.D. completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations.  (Tr. 347-60).  Determining that Plaintiff suffered from depression, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) of the Listing of Impairments.  (Tr. 348-56).  The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular impairment.  (Tr. 357).  Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and never experienced episodes of decompensation.  (Tr. 357).

On October 22, 2003, Plaintiff informed Dr. Mankoff that her recent SI joint injection had reduced her symptoms "at least 50 percent."  (Tr. 378).

On December 21, 2003, Plaintiff participated in an MRI examination of her lumbar spine, the results of which revealed a "small" annular tear at L4-L5 and "multilevel degenerative disc bulging."  (Tr. 383).

Plaintiff received four therapy injections between January 21, 2004, and May 19, 2004, with positive results.  (Tr. 372-75).  On July 14, 2004, Plaintiff participated in a CT scan of her lumbar spine, the results of which revealed degenerative changes at L4-L5 and L5-S1.  (Tr. 381).

At the administrative hearing, Plaintiff testified that she is unable to work because her "short-term memory is about gone."  (Tr. 400).  She reported that because of her memory difficulties she simply "wander[s] around the house from one task to another," never able to complete any one task.  (Tr. 400).  Plaintiff also reported that she experiences "terrible headaches."

11

(Tr. 400).  Plaintiff reported that "everyday" she experiences headaches so severe that she must lie down.  (Tr. 402-03).

## ANALYSIS OF THE ALJ'S DECISION

### A.  Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability.  *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[4]  If the Commissioner can make a dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.

### B.  The ALJ's Decision

The ALJ determined that Plaintiff suffered from the following severe impairments: (1) post-concussion syndrome and (2) degenerative disc disease of the lumbar spine.  (Tr. 30).  The

---

[4] 1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

ALJ further determined, however, that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 30). The ALJ concluded that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 30-33). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ's Decision is Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retains the capacity to perform work activities requiring her to understand, remember, and carry out short, simple instructions. (Tr. 32). The ALJ further determined that Plaintiff experiences

13

mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 33). The ALJ further determined that following her July 22, 2003 fall, Plaintiff was subject to these additional limitations: (1) she can only occasionally lift/carry 20 pounds, but can lift/carry 10 pounds frequently; (2) she can only occasionally bend, twist, kneel, stoop, crouch, and climb stairs; and (3) she cannot climb ladders or ropes. (Tr. 32). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff was unable to perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Richard Riedl.

The vocational expert testified that there existed approximately 21,000 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 425-26).

14

This represents a significant number of jobs.  *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006) (870 jobs in region constitutes a significant number).

The vocational expert also testified that if Plaintiff were further prohibited from "prolonged walking or standing and would need the ability to alternate between sitting and standing pretty much as, as needed," there still existed 7,600 jobs which she could perform despite her limitations.  (Tr. 426-27).

a.   The ALJ Properly Evaluated Plaintiff's Non-Exertional Limitations

As discussed above, at step four of the sequential disability evaluation process, the ALJ is required to assessed the claimant's residual functional capacity.  As part of this process, when there exists evidence that the claimant also suffers from a non-exertional (i.e., a mental) impairment, the ALJ is required to specifically evaluate the claimant's limitations in the following areas: (1) activities of daily living, (2) social functioning, (3) concentration, persistence or pace, and (4) episodes of decompensation.  *See* 20 C.F.R. § 404.1520a.  Plaintiff asserts that the ALJ's assessment of Plaintiff's limitations in these categories is legally deficient.

As noted above, on October 14, 2003, Dr. Schirado completed a Psychiatric Review Technique form in which he assessed Plaintiff's limitations in the aforementioned categories.  The ALJ evaluated Dr. Schirado's conclusions and found them to be "consistent with the record as a

whole." (Tr. 32).  Nonetheless, the ALJ's conclusions did not precisely mirror Dr. Schirado's with respect to the four categories identified above.

Dr. Schirado found that Plaintiff experienced mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and never experienced episodes of decompensation.  On the other hand, the ALJ concluded that Plaintiff experiences mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.  (Tr. 33).  While Dr. Schirado found that Plaintiff experienced only "mild" difficulties maintaining concentration, persistence or pace, the ALJ found that Plaintiff experienced "moderate" difficulties in this area.  Also, while Dr. Schirado found that Plaintiff suffered from depression, the ALJ found that Plaintiff suffered from post-concussion syndrome.

Plaintiff argues that the ALJ's assessment of Plaintiff's limitations in the four categories identified above is legally deficient because while the ALJ found Dr. Schirado's opinions to be "consistent with the record as a whole," the ALJ's conclusions in this regard do not mimic Dr. Schirado's conclusions.  Plaintiff further asserts that this error is "complicated by" the ALJ's "treatment of the opinion of Dr. Krol."[5]  Plaintiff's argument is misplaced.

Plaintiff has not challenged the ALJ's conclusion that the opinions expressed by Dr. Schirado or Dr. Krol are "consistent with the record as a whole."  Instead, Plaintiff faults the ALJ

_____

[5]  As noted above, Dr. Krol reviewed Plaintiff's medical records and while she did not evaluate Plaintiff's impairments in the four categories identified above, she did conclude that Plaintiff experiences "decreased concentration, decreased ability to remember instructions and locations, and a decreased attention span, but no medical condition other than a psychiatric cause has been found for this."  Finding that Dr. Krol's conclusions were "consistent with the record as a whole," the ALJ accorded them "great weight."  (Tr. 32).

for declining to adopt in full the opinions expressed by Dr. Schirado.  Plaintiff suggests that by finding that Dr. Schirado's opinions were "consistent with the record as a whole," the ALJ was obligated to *completely* incorporate the doctor's opinions.  Plaintiff has identified no authority for this proposition.

The question before this Court is not whether the ALJ incorporated the appropriate portion or percentage of any opinion articulated in the administrative record.  Instead, the relevant question for this Court is whether the ALJ's decision complies with the relevant legal standard and is supported by substantial evidence.  The Court agrees with the ALJ that the opinions expressed by Dr. Schirado or Dr. Krol are "consistent with the record as a whole."  Dr. Schirado and Dr. Krol both concluded that Plaintiff suffered from a non-exertional impairment.  The ALJ agreed and pursuant to the regulation cited above assessed Plaintiff's limitations in the four categories identified therein. The ALJ's conclusion in that regard is supported by substantial evidence.

Plaintiff also asserts that the ALJ's RFC assessment is faulty because the ALJ failed to specifically assess Plaintiff's "ability to respond appropriately to supervisors and co-workers and to handle work pressures in a work setting."  Plaintiff has identified no authority for this proposition, but instead argues that the ALJ's RFC assessment fails to adequately articulate the extent to which Plaintiff is impaired by her mental impairment.  Plaintiff's argument, therefore, is more appropriately interpreted as a challenge to the accuracy of the ALJ's RFC determination, rather than a failure by the ALJ to assess Plaintiff's limitations pursuant to the proper legal standard.

The ALJ found that as a result of post-concussion syndrome, Plaintiff experienced the following non-exertional limitations: (1) Plaintiff can perform work activities requiring her to understand, remember, and carry out short simple instructions; (2) she experiences mild restrictions

in the activities of daily living; (3) she experiences mild difficulties in maintaining social functioning; (4) she experiences moderate difficulties in maintaining concentration, persistence or pace; and (5) has never suffered an episode of decompensation.  As discussed above, the ALJ's RFC determination is supported by substantial evidence.  The evidence of record simply fails to support Plaintiff's argument that her ability to perform work activities is limited to an extent beyond that recognized by the ALJ.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence.  Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  July 25, 2008                                        /s/ Ellen S. Carmody
                                                     ELLEN S. CARMODY
                                                     United States Magistrate Judge

18